UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| DEWAYNE MCCLOUGH, | CASE NO. 1:22-CV-0574 |
| Plaintiff, | MAGISTRATE JUDGE DARRELL A. CLAY |
| vs. | **MEMORANDUM OPINION AND ORDER** |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | |

## INTRODUCTION

Plaintiff Dewayne McClough filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On April 11, 2022, pursuant to Local Civil Rule 72.2, this matter was referred to me for preparation of a Report and Recommendation. (Non-document entry dated April 11, 2022). Subsequently, all parties consented to my exercising jurisdiction over this matter pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure (ECF #8); accordingly, on May 31, 2022, this matter was reassigned to me for disposition (non-document entry dated May 31, 2022). Following review, and for the reasons stated below, I **AFFIRM** the Commissioner's decision denying SSI.

PROCEDURAL BACKGROUND

Mr. McClough filed for SSI on October 29, 2019, alleging a disability onset date of January 22, 2009. (Tr. 176-82). His claim was denied initially and on reconsideration. (Tr. 118-25, 126-28). He then requested a hearing before an Administrative Law Judge. (Tr. 173-75). Mr. McClough, represented by counsel, and a vocational expert (VE) testified before the ALJ on November 17, 2020. (Tr. 73-95). On January 5, 2021, the ALJ issued a written decision finding Mr. McClough not disabled. (Tr. 51-72). The Appeals Council denied Mr. McClough's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-7; *see* 20 C.F.R. §§ 416.1455, and 416.1481). Mr. McClough timely filed this action on April 10, 2022. (ECF #1).

FACTUAL BACKGROUND

I.  PERSONAL AND VOCATIONAL EVIDENCE

Mr. McClough was 24 years old on his alleged onset date, and 36 years old at the time of the administrative hearing. (Tr. 54). He has no past relevant work, primarily due to being incarcerated from 2012 to 2019. (Tr. 80-81). He has completed schooling through the eighth grade and attempted unsuccessfully to obtain his GED while incarcerated. (Tr. 86).

II.  RELEVANT MEDICAL EVIDENCE

Mr. McClough was incarcerated between 2012 and 2019 on burglary and robbery charges. (Tr. 902). At a mental status exam completed on April 23, 2013, Mr. McClough related to the examiner "in an open, almost child-like way[,]" and the evaluator noted Mr. McClough probably had a learning disability. (Tr. 907). Mr. McClough described hearing voices. (*Id.*). His mood was slightly elevated, with a reactive affect. (*Id.*). He was diagnosed with bipolar disorder, a mood disorder, and substance abuse disorders. (Tr. 909).

In July of 2014, he was admitted to the prison infirmary due to symptoms of anxiety with suicidal ideation. (Tr. 280). He complained of hearing voices telling him to harm himself and others. (Tr. 322). He was prescribed Lithium. (Tr. 278). Mr. McClough also has a history of seizure disorder and was given Dilantin, which was continued at a follow up examination on September 18, 2014. (Tr. 909, 332). Laboratory testing consistently revealed low levels of the Dilantin in Mr. McClough's bloodstream, suggesting he was not complying with his medication regimen. (*E.g.*, Tr. 485, 486, 496). As of May 2019, he had been off seizure medications for four years without suffering any further seizures. (Tr. 1073). Mr. McClough also discontinued his psychiatric medications at that time, reporting he could manage his symptoms without medications. (Tr. 1078). In an evaluation shortly before his release, Mr. McClough reported having mood fluctuations and impulsive behavior. (*Id.*).

Mary Kelly, LSW, evaluated Mr. McClough on November 13, 2019, at Frontline Services shortly after his release. (Tr. 1802). LSW Kelly rated his Global Assessment of Functioning score (GAF) between 31-40. (*Id.*). Mr. McClough reported experiencing insomnia, panic attacks, feelings of irritability, hopelessness, worthlessness, and suicidal ideation. (Tr. 1826). He reported none of his past psychiatric medications were effective. (*Id.*) Mr. McClough reported using opiates daily since he was age 17, including while incarcerated. (Tr. 1828).

In the third grade, Mr. McClough was placed in special education classes. (Tr. 1830). He reported having issues in school after ingesting lead paint, which required a month-long hospitalization. (Tr. 1830). Mr. McClough endorsed symptoms of PTSD including intrusive thoughts and nightmares, avoidance behaviors, negative beliefs, irritability, hyper vigilance and problems with concentration. (*Id.*). LSW Kelly diagnosed Mr. McClough with opioid dependence

3

and unspecified PTSD. (Tr. 1806). He was prescribed Prozac, Clonidine for opioid withdrawal, and Zofran for nausea (Tr. 1831).

The next day, Dr. Javier Terashima completed a psychiatric assessment of Mr. McClough. (Tr. 1842). Mr. McClough explained his low frustration tolerance and poor impulse control have led to violent outbursts since early childhood. (*Id.*). When he does not understand a situation or he is offended by something, he becomes triggered, which resulted in multiple fights while in prison. (*Id.*). He denied being violent at home because he cares about his family. (*Id.*). Mr. McClough reported recent irritability due to not using opiates in the past two days. (*Id.*). He endorsed decreased sleep, nightmares, and flashbacks occurring six times in the past month related to witnessing violence while in prison. (*Id.*) Dr. Terashima diagnosed Mr. McClough with "opioid use disorder, currently in withdrawal" and "unspecified neurodevelopmental disorder," which Dr. Terashima further described as "intellectual disability versus learning disability" "possibly related to lead poisoning." (Tr. 1847). Dr. Terashima's assessment was co-signed by Neil Goldenberg, M.D. (*Id.*).

On December 12, 2019, Mr. McClough followed up with Dr. Goldenberg. (Tr. 1912). Mr. McClough reported abstinence from drugs since the previous visit. (Tr. 1915). He was experiencing nightmares relating to prison four times per week, which had not improved since his initial evaluation. (Tr. 1912). He avoided crowds because they cause him to feel anxious and sweaty with palpitations. (*Id.*). Dr. Goldenberg noted a largely normal mental status examination aside from Mr. McClough having only "partial" insight with mildly impaired judgment, noting he was easily distracted by his phone. (*Id.*). Mr. McClough denied auditory hallucinations but noted his mother complains he talks to himself. (Tr. 1913).

4

Dr. Goldenberg noted Mr. McClough presented with poor eye contact, limited coping skills, and appeared "traumatized by extensive incarceration history and long periods of time in solitary confinement." (Tr. 1915). And, "there is concern of underlying neurodevelopmental disorder, which has been compounded with sustained opioid use since age 17…these factors complicate his mental health symptoms and the prognosis of response to medications." (*Id.*). Dr. Goldenberg prescribed Sertraline and Prazosin for trauma-related nightmares. (*Id.*).

On May 6, 2020, Mr. McClough attended a telehealth consultation with Dr. Goldenberg. (Tr. 1908). Mr. McClough explained his mood has never been so unstable. (*Id.*). He stopped taking the Sertraline and Prazosin due to intense drowsiness; he still could not handle public spaces and while he "used to love people prior to going to prison," he now "hates people" and experiences ongoing nightmares and flashbacks, waking up in cold sweats. (*Id.*) Dr. Goldenberg prescribed Aripiprazole to address mood stabilization and hypervigilance, and Escitalopram for anxiety and trauma symptoms. (Tr. 1911). His clinical impression included "trauma related mood disorder from prison time, [history] of learning disability and poor impulse control (speculating lead exposure vs fetal alcohol syndrome)." (*Id.*).

At that time, Dr. Goldenberg also filled out a mental assessment form (Tr. 1883-84), noting Mr. McClough could be expected to have "marked" difficulties in cooperating with others, asking for help when needed, and in handling conflicts with others. (Tr. 1883). Mr. McClough would have "extreme" difficulties in being able to respond appropriately to requests, suggestions, criticism, and correction, as well as having extreme difficulty keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness. (*Id.*). He would also have marked difficulties in working close to or with others without interrupting them or distracting

5

them and in his ability to sustain an ordinary routine and regular attendance at work. (*Id.*). He would further have marked difficulty in being able to work a full workday without needing excessive rest periods. (*Id.*).

Dr. Goldenberg noted, once again, diagnoses of PTSD and opioid use in remission "on top of a lifelong neurodevelopmental disability characterized by poor comprehension, poor concentration and poor impulse control." (*Id.*). Suspecting either childhood lead exposure or fetal alcohol syndrome, Dr. Goldenberg found Mr. McClough was tense, irritable, and argumentative around others. (*Id.*). Finally, Dr. Goldenberg wrote: "I do <u>not</u> feel he is ready for gainful employment at this time." (*Id.*).

On May 18, 2020, Rachel Citak, LISW-S, terminated counseling services with Mr. McClough because he was not engaging in the services. (Tr. 1892). Although he met with his case manager in November and December 2019, he did not meet with her as agreed upon in January of 2020. (Tr. 1859). After two outreach attempts in April of 2020, Frontline reported Mr. McClough "did not engage regularly in counseling" and "was not very responsive to" outreach. (Tr. 1893). LISW-S Citak noted Mr. McClough's case would remain open for psychiatric and case management services. (*Id.*).

At a follow-up visit with Dr. Goldenberg on June 10, 2020, Mr. McClough said he was "doing ok." (Tr. 1940). Dr. Goldenberg wrote Mr. McClough's mood had improved with Aripiprazole and Escitalopram, and he was having fewer nightmares and cold sweats. (*Id.*). However, Dr. Goldenberg noted Mr. McClough's affect was still constricted, again with partial insight and mildly impaired judgment. (Tr. 1941-42). While Mr. McClough's mood had stabilized

"somewhat," he continued to struggle with agoraphobia. (Tr. 1944). Dr. Goldenberg maintained the prescribed dosage of Aripiprazole but increased the dosage of Escitalopram. (Tr. 1947).

On July 22, 2020, Dr. Goldenberg noted Mr. McClough's opioid use disorder was now in remission. (Tr. 1965). Mr. McClough continued to isolate himself. (*Id.*). He was comfortable when at home but became nervous and edgy outside, and medications only partially helped reduce his hypervigilance. (*Id.*). Mr. McClough continued to display a constricted affect, although he described his mood as "fine." (Tr. 1967).

On July 29, 2020, Kristian Thompson, Mr. McClough's case manager, noted he had acted inappropriately by jokingly asking her out on a date. (Tr. 1982). She admonished him, explaining such behavior was not acceptable, and he apologized for his behavior and stated he understood. (*Id.*). Regarding medications, Ms. Thompson noted: "he will take them from time to time[,] just not as prescribed[.]" (Tr. 1979).

On September 16, 2020, Dr. Goldenberg and Mr. McClough spoke on the phone, but the phone call was cut off after a few minutes and Mr. McClough did not answer when Dr. Goldenberg called back. (Tr. 1971). In that brief phone call, Mr. McClough reported still tending to isolate himself and avoid crowds. (*Id.*). He reported "doing better" but continued having arguments with his mother. (*Id.*). His affect remained constricted, and Dr. Goldenberg described his thought processes as being "vague." (Tr. 1973).

## III.   MEDICAL OPINIONS

State agency medical consultants reviewed Mr. McClough's record at the initial and reconsideration levels.

On December 26, 2019, Mr. McClough's file was reviewed by Dr. David Dietz, Ph.D., at the request of the State Disability Determination Service. (Tr. 111-13). Dr. Dietz opined Mr. McClough would be capable of performing simple, repetitive one-to-two step tasks. (Tr. 111). He would be capable of performing work-related tasks in a "slow to moderate paced environment" without fast-paced production or strict deadline constraints. (Tr. 112). He could tolerate occasional, superficial contact with co-workers and supervisors, but could have no contact with the public. (*Id.*). He could tolerate a static work environment with only occasional changes, and one where major changes in routine were explained in advance. (*Id.*).

Aracelis Rivera, Psy.D., reviewed the evidence at the reconsideration level for the state agency on May 26, 2020. (Tr. 122-123). Dr. Rivera reviewed Dr. Goldenberg's May 6, 2020 assessment, but did not adopt Dr. Goldenberg's opinions because Mr. McClough's visits were too sporadic and inconsistent to paint a clear picture of his health. (Tr. 122). Dr. Rivera opined Mr. McClough was capable of understanding, remembering, and completing two-to-three step tasks, although Dr. Rivera wrote Mr. McClough "may not have the internal resources to deal with stress and pressure effectively" (*id.*), but could adapt to routine changes (Tr. 123). Dr. Rivera limited Mr. McClough to only having superficial interaction with others but noted he "would not be well-suited to customer service positions." (Tr. 122).

## IV.    OTHER RELEVANT EVIDENCE

Mr. McClough was assessed on May 8 and 10, 2000 using an individual battery of psychological tests. (Tr. 255). The Wechsler Individual Achievement Test (WIAT) revealed a then 15-year-old Mr. McClough could read at a fourth- to fifth-grade level, spell at a fourth-grade level, and engage in math reasoning at a fifth-grade level. (Tr. 256). A Weschler Intelligence Scale for

Children, third edition (WISC-3), showed a verbal IQ of 66 (deficient), performance IQ of 74 (borderline), and a full-scale IQ of 68 (deficient). (*Id.*). He cooperated "fairly well" with the test protocols, and it was felt the scores reported were valid representations of his skills on that date. (Tr. 255).

Testing for adaptive behavior disclosed a composite score of 65, consistent with a mild delay in adaptive skills (Tr. 257), with deficiencies in communication and socialization. The evaluation team noted Mr. McClough could be expected to have significant difficulty in communicating and socializing with his peers. (Tr. 257). His language scores were in a very poor range but were seen as compatible with his ability. (Tr. 258). Because of the evaluation, Mr. McClough met the definition for developmental handicap, based on significantly sub-average general intellectual functioning with concurrent deficits in adaptive behavior "manifested during the developmental period." (Tr. 259). An Individualized Education Plan (IEP) provided Mr. McClough with accommodations, including extra time to complete work, assistance using visual cues for organizing work, specific directions using concrete cues, and minimizing copying from the blackboard. (*Id.*). His IEP was continued after he transferred to a different school district the next school year. (Tr. 260). He spent part of the school day in regular classes but 61% of the school day in special educational services. (Tr. 273). Mr. McClough was found to be disabled in the category of "mental retardation." (Tr. 273).

V.    ADMINISTRATIVE HEARING

At the hearing before the ALJ, Mr. McClough testified about experiencing anxiety around people. (Tr. 80). While incarcerated, he had restrictions requiring him to attend mental health counseling once a week. (Tr. 81). He currently lives with his mother but is trying to obtain other

living arrangements. (*Id.*). His drug use has not affected his ability to work in any way and while on

probation, his urine samples consistently tested negative for opiates. (*Id.*).

Mr. McClough testified he is not able to work a full-time job because he cannot stay

focused. (Tr. 83). He gets nervous around people due to his experiences in prison and believes

people are going to hurt him. (*Id.*). When he goes to the store, he has trouble breathing and must

sit down from his anxiety. (*Id.*). He does not go outside much and he only leaves his bedroom for

appointments. (Tr. 84). He no longer rides the bus because he will have to get off the bus and have

his sister come and pick him up from the street. (*Id.*).

Mr. McClough reported losing every job due to these symptoms. (Tr. 84). For some of

them, he could not stay focused and was sidetracked easily. (*Id.*). He is unable to pay attention or

sit still. (*Id.*). Mr. McClough became emotional discussing his relationship with his mother, who he

says no longer stays with him in their house on a regular basis because she is afraid of his temper.

(Tr. 85). His mother's husband passed away a few months prior to the hearing and he feels he

cannot be there to support her because he is focused on getting himself "together." (Tr. 85-86).

The last year of school Mr. McClough completed was eighth grade. (Tr. 86). He has

difficulty reading and his handwriting is "terrible." (*Id.*). For example, when he goes to

McDonald's, he will have to read the menu two or three times before he will understand. (*Id.*). He

attempted multiple times to obtain his GED while in prison but failed the tests. (*Id.*).

Mr. McClough has trouble sleeping almost every night. (Tr. 87). Sometimes he is unable to

breathe and stays up the rest of the night because he is unable to go back to sleep due to his

nerves. (*Id.*). He experienced trouble sleeping prior to going to prison, but his experiences in

prison exacerbated the problem. (*Id.*). He explained he did not take his medications as prescribed because they would "knock him out." (Tr. 88).

VE Robert Breslin then testified.

**Hypothetical One.** VE Breslin assumed a hypothetical individual of Mr. McClough's age and education with Mr. McClough's work history who is subject to no exertional limitations, but the following non-exertional limitations: limited to completing simple, repetitive, one- and two-step tasks without fast-pace production quotas or strict deadline constraints; occasional superficial contact with coworkers and supervisors, but no contact with the general public; and work in a static environment with few changes, where changes would need to be explained in advance. (Tr. 91). VE Breslin testified the individual could perform unskilled jobs such as sweeper (DOT 389.683-010), kitchen helper (DOT 318.687-010), or cleaner II (DOT 919.687-014). (*Id.*).

**Hypothetical Two.** VE Breslin assumed the same limitations as Hypothetical One, but also assumed the hypothetical person would miss more than one workday per month or be off task while on the job, unable to complete job duties for 20 percent or more of the workday. (Tr. 92). VE Breslin testified under either of those limitations, it would be impossible for the individual to maintain employment in any competitive jobs. (*Id.*).

**Hypothetical Three.** VE Breslin assumed the same limitations as Hypothetical One, but also assumed that the individual would be limited to simple work and would need to work in isolation. (*Id.*). VE Breslin testified it is very difficult to identify unskilled work done in isolation, because unskilled jobs are generally done in departments with other people doing similar work. (*Id.*). For example, a cleaner would still tend to be around people in the environment, although the

cleaner may not need to interact with them as part of the job. (*Id.*). As such, there would be no work fitting those limitations. (*Id.*).

## VI.  THE ALJ'S DECISION

The ALJ's January 8, 2021 decision included the following findings of fact and conclusions of law:

1.  The claimant has not engaged in substantial gainful activity since October 18, 2019, the application date (20 CFR 416.971 et seq.).

2.  The claimant has had the following severe impairments since he applied for supplemental security income on October 18, 2019: bipolar disorder, a neurodevelopmental disorder, attention deficit hyperactivity disorder, and a trauma related mood disorder resulting from his eight-year imprisonment (20 CFR 416.920(c)).

3.  The claimant has not had an impairment or combination of impairments since he applied for supplemental security income on October 18, 2019 that has met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, 416.926).

4.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels subject to the following non-exertional limitations/within the below described parameters: He has been limited to simple, repetitive one- to two-step tasks without fast-paced production quotas or strict deadline constraints. He has been limited to occasional superficial contact with coworkers and supervisors and no contact with members of the public. In addition, he cannot perform tandem tasks. The claimant has been further limited to working in a static work environment with few changes that would need to be able to be explained in advance.

5.  The claimant has no past relevant work (20 CFR 416.965).

6.  The now 36-year-old claimant was 35-years-old, or a younger individual in the "18 to 49" age group when he applied for supplemental security income on October 18, 2019 (20 CFR 416.963).

7.  The claimant has a limited education (20 CFR 416.964).

8.    Transferability of job skills is not an issue because the claimant does not have past relevant work.

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant has been able to perform since he applied for supplemental security income on October 18, 2019 (20 CFR 416.969 and 416.969(a)).

10.   The claimant has not been under a disability, as defined in the Social Security Act, since October 18, 2019, the date the application was filed (20 CFR 416.920(g)).

(Tr. 54-68).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the

court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is because there is a "zone of choice" within which the Commissioner can act without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

But "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner

follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine if a claimant is

disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One

through Four. *Walters,* 127 F.3d at 529. The burden then shifts to the Commissioner at Step Five

to establish whether the claimant has the residual functional capacity (RFC) to perform available

work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past

work experience to determine if the claimant could perform other work. *Id.* Only if a claimant

satisfies each element of the analysis, including inability to do other work, and meets the duration

requirements, is she determined to be disabled. 20 C.F.R. § 416.920(b)-(f); *see also Walters*, 127

F.3d at 529.

## DISCUSSION

### I. Substantial evidence supports the ALJ's determination that Mr. McClough did not meet Listing 12.05.

Mr. McClough first argues the ALJ erred in failing to consider whether Mr. McClough met

the requirements of Listing 12.05 for intellectual disability. (Pl.'s Br., ECF #10, PageID 2038).

Specifically, he asserts the record included evidence of intellectual testing scores and opinion evidence of marked impairment of functioning in at least two of the listed areas of mental functioning, obligating the ALJ to determine whether Mr. McClough met the requirements of Listing 12.05. (*Id.*). Following review of the entire record, I find the ALJ did consider the relevant criteria for Listing 12.05.

While an ALJ is required to find a claimant disabled if he meets a listing, *see* 20 C.F.R. §§ 416.920(a)(4)(iii), neither the Listings nor the Sixth Circuit require an ALJ to address every Listing:

> The relevant regulations require the ALJ to find a claimant disabled if he meets a listing. Yet they do not require the ALJ to address every listing—and with ample reason. There are a hundred or so listings. In the normal course, as a result, the ALJ need not discuss listings that the applicant clearly does not meet, especially when the claimant does not raise the listing before the ALJ. If, however, the record "raise[s] a substantial question as to whether [the claimant] could qualify as disabled" under a listing, the ALJ should discuss that listing.

*Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x 639, 641 (6th Cir. 2013) (citing *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir. 1990)). A claimant has the burden to show he met the criteria of the Listing, and the ALJ has a low articulation threshold for his step three finding. *See Gonzales v. Comm'r of Soc. Sec.*, No. 3:13 CV 2341, 2015 WL 687850, at *6 (N.D. Ohio Feb. 18, 2015). The court must find an ALJ's decision contains "sufficient analysis to allow for meaningful judicial review of the listing impairment decision." *Snoke v. Astrue*, No. 2:10-cv-1178, 2012 WL 568986, at *6 (S.D. Ohio 2012) (internal quotation omitted).

The court may look to the ALJ's decision in its entirety to justify the ALJ's step three analysis. *Id.* Thus, while the ALJ in this case did not explicitly analyze whether Mr. McClough met Listing 12.05, in reviewing the decision as a whole, I can determine whether the ALJ considered the relevant criteria of the Listing as applied to Mr. McClough.

16

Mr. McClough asserts he meets Listing 12.05(B), which is satisfied by the following:

1.   Significantly subaverage general intellectual functioning evidenced by a or b:

    a.   A full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general intelligence; or

    b.   A full scale (or comparable) IQ score of 71-75 accompanied by a verbal or performance IQ score (or comparable part score) of 70 or below on an individually administered standardized test of general intelligence; and

2.   Significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:

    a.   Understand, remember, or apply information (see 12.00E1); or

    b.   Interact with others (see 12.00E2); or

    c.   Concentrate, persist, or maintain pace (see 12.00E3); or

    d.   Adapt or manage oneself (see 12.00E4); and

3.   The evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22.

20 C.F.R. § 404.1525, Appendix 1, Subpart P.

Criteria 2 requires Mr. McClough exhibit significant deficits in adaptive functioning currently manifested by extreme or marked limitations of the four relevant categories. The ALJ addressed each of those categories in depth and, because the Listing requires all three criteria met, the ALJ's analysis is dispositive.

**A.   "Understand, remember, or apply information"**

First, the ALJ explicitly considered whether Mr. McClough had an extreme or marked limitation in his ability to understand, remember, or apply information. The ALJ found Mr. McClough  was only moderately limited in this area. (Tr. 58). Considering the record in its

entirety, the ALJ found a moderate limitation supported by the opinions of state agency psychologists David Dietz, Ph.D., and Aracelis Rivera, Pys.D., as well as treating psychiatrist Neal Goldenberg, M.D. (*Id.*). Dr. Goldenberg's medical source statement identified only mild to moderate levels of impairment in all categories relating to the ability to understand or apply information. (Tr. 1883). The ALJ explained no medical source described Mr. McClough as having marked or extreme limitations with respect to his ability to understand, remember, or apply information; treatment records since October of 2019 seemingly included few, if any, complaints made regarding problems with understanding, remembering, or applying information; Mr. McClough has been able to travel by himself using public transportation, an activity requiring the ability to understand, remember, and apply information; and he was able to understand and answer questions during his hearing. (Tr. 58).

       **B.**        **"Interact with others"**

       The ALJ next considered whether Mr. McClough had an extreme or marked limitation in his ability to interact with others. Again, the ALJ found only a moderate social functioning problem, supported by the opinions of Drs. Dietz and Rivera. (Tr. 58). The ALJ noted treatment records did not document any instances of Mr. McClough having problems interacting with others; he was able to go out in public to attend his medical appointments since October 2019; he has been able to travel by himself using public transportation; his mental functioning has not been so poor at any time since application that it has attracted the attention of civil or criminal authorities; he was able to interact adequately with a claims representative who interviewed him on October 28, 2019; and he was able to interact with the ALJ and his attorney during the hearing. (*Id.*).

By contrast, Dr. Goldenberg's medical source statement indicated a moderate limitation in the ability to initiate or sustain conversation and marked limitations in Mr. McClough's ability to cooperate with others, ask for help when needed, handle conflicts with others, and understand and respond to social cues. (Tr. 1883). He found extreme impairment in Mr. McClough's ability to respond to requests, suggestions, criticism, correction, and challenges as well as keep social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness. (*Id.*).

But the ALJ explained why he found Dr. Goldenberg's opinion in this area to be inconsistent with the remainder of the record. (Tr. 59). He explained Dr. Goldenberg's opinion was inconsistent with the opinions of Drs. Dietz and Rivera and relied too heavily on symptoms not documented in Mr. McClough's chart since the October 18, 2019 SSI application date. (*Id.*). "For example," the ALJ explained, "Dr. Goldenberg described the claimant as having poor concentration and poor impulse control," but Mr. McClough's treatment records "on balance, do not document significant concentration problems or instances of poor impulse control." (*Id.*). Similarly, while Dr. Goldenberg described Mr. McClough as being "tense, irritable, and argumentative around others" as well as "frequently being aroused because of exposure to trauma triggers," the ALJ pointed out the absence of documentation of significant tension or irritability instances where the claimant has argued with others. (*Id.*). While there is evidence that Mr. McClough may have more than a moderate impairment in this area, the ALJ sufficiently identified that evidence and explained why he found it inconsistent with other medical sources.

C.      **"Concentrate, persist, and maintain pace"**

Third, the ALJ considered whether Mr. McClough had an extreme or marked limitation in his ability to concentrate, persist, or maintain pace. Again, the ALJ found Mr. McClough had no

more than moderate limitations in this area. (*Id.*). In addition to the supporting opinions of Drs. Dietz and Rivera, the ALJ found Mr. McClough's treatment records documented, on balance, relatively few complaints he has made in terms of concentration, persistence, or pace; relatively few examples of him being observed to have problems concentrating, persisting at tasks, or pacing himself; and Mr. McClough has, on almost all occasions since applying for SSI, been described as being alert and properly oriented. (*Id.*). Additionally, he was able to maintain attention and concentration during the hearing. (*Id.*).

Dr. Goldenberg's medical source statement indicated moderate impairments in Mr. McClough's ability to initiate and perform a task he understands and knows how to do, work at an appropriate and consistent pace, complete tasks in a timely manner, ignore or avoid distractions while working, and change activities or work settings without being disruptive. (Tr. 1883). However, he found marked impairments in Mr. McClough's ability to work close to or with others without interrupting or distracting them, sustain an ordinary routine and regular attendance at work, and work a full day without needing more than the allotted number or length of rest periods during the day. (*Id.*).

The ALJ again did not adopt Dr. Goldenberg's assessment in light of the remainder of the medical evidence, especially the inconsistency with the opinions of Drs. Dietz and Rivera as well as Dr. Goldenberg's reliance on symptoms not documented in the medical chart since Mr. McClough applied for SSI on October 18, 2019. (*Id.*). As an example, the ALJ noted Dr. Goldenberg described Mr. McClough as having poor concentration and impulse control, but his treatment records on balance did not document significant such problems. (*Id.*).

20

D.    "Adapt or manage oneself"

Finally, the ALJ considered whether Mr. McClough had an extreme or marked limitation in his ability to adapt or manage himself. The ALJ found Mr. McClough had no more than moderate limitations with respect to his ability to adapt to changes and manage his affairs. (Tr. 61). The ALJ cited various evidence for this determination in addition to the opinions of Drs. Dietz and Rivera: no medical source described Mr. McClough as having marked or extreme limitations in this area; the medical records contained very few complaints from Mr. McClough or observations by third parties of him having problems adapting to changes or managing his affairs; Mr. McClough has been able to attend his medical appointments, follow prescribed treatment, and take medication;[1] he has had limited mental health treatment, has not been treated emergently because of mental impairments, nor has he been psychiatrically hospitalized; and his mental functioning has not been so poor at any time since he applied for supplemental security income that it has attracted the attention of civil or criminal authorities. (*Id.*). Dr. Goldenberg determined no more than a moderate impairment in Mr. McClough's ability to adapt or manage himself. (Tr. 1883).

* * *

Taken together, although the four criteria of Listing 12.05(B)(2) were explicitly analyzed in the portion of the determination addressing Mr. McClough's RFC, they address the exact criteria required to meet the Listing for intellectual disorder. The ALJ determined Mr. McClough had no

---

[1]    Although the record indicates Mr. McClough does not consistently take his medication, it does not appear to be the result of an inability to understand or manage when and how to take it. Rather, he appears to choose not to take it as prescribed to avoid side effects or because he believes the medication is not working, neither of which bear negatively on his ability to adapt or manage his affairs. (*See, e.g.*, Tr. 33, 42, 88, 1982, 1987).

more than moderate impairments in each category, explained the reasoning behind each finding, and gave concrete examples with citations to the pertinent medical records.

In the absence of any requirement that an ALJ discuss each and every potentially relevant Listing at step three, I find the ALJ did not err in "failing" to consider Listing 12.05; rather, he did consider the requirements of Listing 12.05, found the requirements were not met, and articulated why. Considering step three's low articulation threshold, I find substantial evidence supports the ALJ's decision Mr. McClough did not meet Listing 12.05. Mr. McClough's first argument is unpersuasive.

## II.    The semantic differences in the opinions of Drs. Dietz and Rivera do not render them inconsistent with each other, nor did the ALJ err in failing to explicitly reconcile them.

Mr. McClough next argues the ALJ's "blanket reliance" on the state agency reviewing psychologists' reports in determining Mr. McClough's RFC ignored substantial distinctions between the two opinions, and the ALJ's failure to acknowledge or reconcile the distinctions constitutes reversable error. (Pl.'s Br., ECF # 10, PageID 2041). For the reasons explained below, I find this argument without merit.

The responsibility for determining a claimant's RFC rests with the ALJ, not a physician. *Poe v. Comm's of Soc. Sec.*, 342 Fed.Appx. 149, 157 (6th Cir. 2009) (citing 20 C.F.R. § 416.946(c)). "Although the ALJ may not substitute his opinion for that of a physician, he is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding." *Id.* (citing 20 C.F.R. § 416.945(a)(3)). When evaluating a medical opinion, an ALJ must consider the consistency of the medical opinion with the evidence from other medical sources and nonmedical sources. 20 C.F.R. § 416.920c(c)(2). The more consistent a medical opinion is with the evidence

22

from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion will be. *Id.*

Mr. McClough calls attention to three differences between the opinions of Drs. Dietz and Rivera that the ALJ did not explicitly address in his determination of Mr. McClough's RFC. (Pl.'s Br., ECF #10, PageID 2042). I find none persuasive.

*First*, Dr. Dietz limits Mr. McClough to simple, repetitive one-to-two step tasks (Tr. 111), while Dr. Rivera would allow for two-to-three step tasks. (Tr. 122). The ALJ's RFC limited Mr. McClough to simple, repetitive one-to-two step tasks, which is the more restrictive of the two opinions. (Tr. 62). It is unclear how Mr. McClough believes his RFC should have changed had the ALJ explicitly addressed this minor difference, especially given the ALJ adopted Dr. Dietz's more restrictive limitation.

*Second*, Dr. Dietz limited contact with co-workers and supervisors to being superficial and occasional, and noted there should be no contact with the public at all. (Tr. 112). Dr. Rivera stated Mr. McClough could interact superficially "with others" but did not specify whether "others" included co-workers, supervisors, or the public. (Tr. 122). Dr. Rivera also noted Mr. McClough was not well suited for customer service positions. (*Id.*). It seems readily apparent that Dr. Rivera's statement Mr. McClough was not well suited for public-facing customer service positions indicates his use of the word "others" likely refers only to co-workers and supervisors.

The only remaining differences on this point are also semantic. While Dr. Rivera used the words "superficial and occasional," Dr. Rivera used only "superficial" and not "occasional." The ALJ's RFC restricted Mr. McClough to occasional, superficial contact with coworkers and

supervisors and no contact with members of the public. (Tr. 62). The ALJ again adopted the more restrictive of the two opinions, limiting contact in both areas.

Additionally, Mr. McClough argued Dr. Dietz's use of the word "contact" versus Dr. Rivera's use of the word "interact" was a difference so significant that the ALJ should have provided an explanation for his reliance on the "dissimilar" opinions. (Pl.'s Br., ECF #10, PageID 2042). This is not the type of contradiction warranting explicit discussion by the ALJ. Source opinions need not utilize identical language to be considered consistent for purposes of analyzing a claimant's RFC. *Stoodt v. Comm'r of Soc. Sec.*, No. 3:20-CV-02370, 2022 WL 721455, at *12 (N.D. Ohio Jan. 13, 2022), *report and recommendation adopted sub nom. Stoodt v. Comm'r of Soc. Sec.*, No. 3:20-CV-2370, 2022 WL 716105 (N.D. Ohio Mar. 10, 2022) (internal quotations omitted) ("While the ALJ's language is not identical to that of the psychological consultants, an ALJ is not required to recite the medical opinion of a physician verbatim in [her] residual functional capacity finding"). Otherwise, nearly every medical source statement would be "inconsistent" with other medical source statements merely based on wording. Both opinions indicated contact with co-workers should be superficial at best and contact with members of the public should be avoided. The ALJ adopted these opinions in developing the RFC, which includes those same limitations.

*Finally*, Mr. McClough points out Dr. Rivera did not include Dr. Dietz's limitation to a "slow-to-moderate paced" work environment (Tr. 112) and Dr. Dietz did not include Dr. Rivera's concern Mr. McClough "may not have the internal resources to deal with work pressure

effectively." (Tr. 122). The ALJ limited Mr. McClough to "working in a static environment with few changes that would need to be able to be explained in advance." (Tr. 62).

Again, Drs. Dietz and Rivera's comments reflect similar ideas. Both believed Mr. McClough cannot successfully handle a fast-paced work environment with more than a few impromptu changes. An employee without the internal resources to deal with work pressure effectively would not likely be able to handle either a fast-paced work environment or multiple, sudden changes. The ALJ considered both opinions and, finding them largely consistent, synthesized the restrictions into the RFC in limiting Mr. McClough to working in a static environment with few changes. A more explicit discussion of the differences between the doctors' comments is unnecessary.

In a somewhat related issue, Mr. McClough points out Dr. Rivera rejected the opinions of Dr. Goldenberg because he had only seen Mr. McClough one time (Tr. 122), when in fact, Dr. Goldenberg saw Mr. McClough at office visits on December 12, 2019 (Tr. 1915) and May 6, 2020 (Tr. 1911, 1884), and oversaw his initial evaluation by resident Dr. Terashima on November 14, 2019 (Tr. 1847). (Pl.'s Br., ECF #10, PageID 2043). Mr. McClough argues this misreading of the record casts additional doubt on the ALJ's reliance on Dr. Rivera's opinion. (*Id.*).

I note the May 6, 2020 encounter was via phone (Tr. 1906), while the November 14, 2019 and December 12, 2019 encounters were in-office (Tr. 1842, 1912). At the December 12, 2019 encounter, Mr. McClough was primarily seen by resident Dr. Terashima with supervision from Dr. Goldenberg. (Tr. 1912, 1915). Thus, Dr. Rivera's statement seems be grounded in the fact Mr. McClough was seen in-person by Dr. Goldenberg as his primary physician only once.

In either event, I do not find Mr. McClough's argument persuasive. Dr. Rivera's notes state: "[Dr. Goldenberg] appears to have only seen [Mr. McClough] one time. [H]owever, consideration is given to his statements...Despite an ongoing treating relationship with [Dr. Goldenberg], visits for treatment have been too infrequent or too sporadic to obtain a longitudinal picture of the individual's impairment-related limitations and restrictions." (Tr. 122). I do not believe Dr. Rivera's disagreement with Dr. Goldenberg's assessment of Mr. McClough was wholly based on a belief Dr. Goldenberg had only seen Mr. McClough one time (note he uses the word "visits" rather than "visit" and the phrase "ongoing treating relationship"); instead, Dr. Rivera points out the doctor-patient relationship had not been frequent or consistent enough to paint a holistic picture of Mr. McClough's condition. Length of treatment relationship and frequency of examinations are both appropriate considerations in determining the weight of a medical source opinion. *See* 20 C.F.R. § 416.920c(c)(3)(i) and (ii).

Even if the ALJ did not articulate the few distinctions between the limitations stated by Drs. Dietz and Rivera, Mr. McClough has not shown he was in any way harmed by the adoption of a more restrictive set of limitations or a synthesis of the doctors' opinions. While Mr. McClough argues the ALJ erred in not explaining why certain limitations were not included in the RFC, an ALJ is not required to recite the medical opinion of a physician verbatim in his RFC finding. *See* 20 C.F.R. §416.945(a)(3). Additionally, I do not believe the differences in opinion between Drs. Dietz and Rivera were significant enough to require the ALJ to explain why he did or did not

include specific language used by one doctor over the other. I find Mr. McClough's second argument without merit.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, I **AFFIRM** the Commissioner's decision denying disability insurance benefits and supplemental security income.

Dated: January 31, 2023

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE